# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TESSERON, LTD.,**

        **Plaintiff,**

-vs-                                   **Case No.  6:10-cv-909-Orl-31GJK**

**OCE N.V. and OCE NORTH AMERICA, INC.**

        **Defendants.**

_____

# PRELIMINARY ORDER OF CLAIM CONSTRUCTION

This cause comes before the Court on separate motions to construe terms in two patents, U.S. Patent Nos. 6,381,028 B1 and 6,771,387 B2. Plaintiff, Tesseron, LTD ("Tesseron") filed an Opening Claim Construction Brief (Doc. 64), Defendants, Océ N.V. and Océ North America, Inc. (collectively, "Océ") filed their Response (Doc. 65), and Tesseron replied (Doc. 68). On June 26, 2012, after the foregoing exchange of briefs, the Court held a hearing in this matter.

Because of the highly technical nature of the Patents, the Court will address the disputed terms below and allow the Parties an opportunity to file additional briefs raising any objections they have to the Court's proposed construction. The Court will consider these additional arguments before issuing its final claim construction order.

## I. Background

Plaintiff filed this patent infringement suit on June 10, 2010, asserting claims based on two patents–U.S. Patent No. 6,381,028 B1 ("the '028 Patent") and U.S. Patent No. 6,771,387 B2 ("the

'387 Patent)–against several Defendants, only Océ remains.[1] Both Patents describe a method by which data is organized and processed[2] using a computer[3] to facilitate printing at high speeds for commercial applications. Specifically, it saves static data into a template which is ultimately merged with variable data, allowing for faster processing and thus, faster printing. After the hearing, it became clear that only ten terms were in dispute, the Court will address each in turn.

**II. Standard**

It is well established that patent claim construction is a question of law for the Court's determination. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). The goal is to determine how a patent claim's terms would be understood by a person of ordinary skill in the relevant art at the time of the invention. *Id.* at 986. This analysis begins with an examination of the intrinsic evidence, that is, the claims, the patent specification, and the prosecution history. *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003). Among these forms of intrinsic evidence, the analysis begins first with a claim's terms and the "strong presumption" that they carry their ordinary meaning as viewed by a person of ordinary skill in the art. *Id.* Although the Court may rely on extrinsic evidence, such as expert testimony, that is appropriate only to the extent the Court is

---

[1] The specific claims at issue are as follows: with respect to the '028 Patent, only claim number 4 is at issue; with respect to the '387 Patent, claims1-19, 21 and 22 are at issue. The two Patents share a common specification as the '387 Patent is a continuation of the '028 Patent.

[2] "Processed" is a disputed term in this case. The Court uses it here in the broadest sense only to describe the nature of the patents involved.

[3] Whether the process occurs in a computer or a printer is disputed.

unable to construe the disputed terms from the totality of intrinsic evidence. *Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

## III. Analysis

The following discussion will address each of the disputed terms in the order presented at the claim construction hearing. Although there are two separate patents at issue, one is a continuation of the other and the disputed terms appear in each. At the hearing and in their papers the parties do not distinguish between the two patents, and neither will the Court unless otherwise noted.

### 1. "Data Area"[4]

The first dispute with respect to this term is whether "data area" refers to an area on the printed page, or in the page description code specification. After reviewing the transcript of the claim construction hearing, however, there appears to be no dispute on this issue as Tesseron said itself: "data area" is a "document area defined in the page description code specification." Claim Constr. Hr'g Tr., Doc. 86, 27:4-5, June 26, 2012 (hereinafter, Doc. 86).

The parties also dispute whether "data area" is a root term, or is synonymous with "variable data area." Initially, "data area" appears to be a root term as used in both patents. Sometimes it appears by itself, and other times it is used in conjunction with the words "variable" and "static." The obvious implication is that "data area," when used by itself, may refer to either (or both) "static data areas" and "variable data areas."

---

[4] It is worth noting at the outset that "data area," by itself, is not used in the disputed claim of the '028 Patent–it refers only to "static data areas" or "variable data areas." The opposite is true for the disputed claims of the '387 Patent–the terms "static data area" and "variable data area" are not used at all. Instead, the disputed claims of the '387 Patent refer only to "data areas" generally.

With respect to the disputed claims of the '387 Patent however, "data area" is synonymous with the term "variable data area." (*See* Doc. 65 at 13). For example, in claim 1 of the '387 Patent, a "data area" is an area "into which at least one of a plurality of *variable bitmaps is to be merged . . .*" '387 Patent, col. 9, lns. 18-20 (emphasis added). The detailed description in the '387 Patent explains that "variable data bitmaps" contain "variable data," and are ultimately inserted into "variable data areas." *See* '387 Patent, col. 8, lns. 29-37.[5] Thus, "data area" in the disputed claims of the '387 Patent is clearly intended to refer to "variable data areas."

Tesseron argues in response that it is "dangerous" to construe the term "data area" so narrowly because there are twenty other patents, "[a]nd how many of those patents have the term data area in there, and who knows how that's used in other claims." (Doc. 86, 43:13-15). It concludes that "by this Court relying on the context in which a general term data area was used as requiring that any time that data area is used in any other claim is going to mean as a variable data . . . well, that's wrong." (Doc. 86, 43:16-19). This argument is not persuasive. The instant dispute concerns only the language of the disputed claims. In the disputed claims of the '387 Patent, "data area" is synonymous with "variable data area." That it might be used in other patents or claims to refer to "static data areas" is irrelevant, and not inconsistent with this construction.

---

[5] *See also* '387 Patent, col. 10, lns. 13-16 (" . . .wherein the step of producing the plurality of variable data bitmaps further includes the step of associating the attribute defined in the external file with the data area."); '387 Patent, col. 9, lns. 23-24 ("merging at least a first one of the plurality of variable data bitmaps into the one data area . . ."); '387 Patent, col. 10, lns. 39-53; '387 Patent , col. 12, lns. 58-61).

There is also a dispute about whether "data areas" must be identified by the use of an "indicator." Since "data area" is used interchangeably with "variable data area" in the disputed claims, the Court will address this dispute below.

### 2. "Variable Data Area"

There are two issues with respect to this term, (1) whether a "variable data area" must be defined by "indicators," and (2) whether a "variable data area" may contain non-variable (static) data.

With respect to the first question, a plain reading of the patent suggests that there must be something to allow the control task to distinguish between "variable data areas" and "static data areas"–an example in the specification uses a sort of indicator ("<< >>"). To be precise, however, the claims state only that the process includes "identifying the variable data area." Simply that a "variable data area" must be identifiable does not mean that it must be identified through the use of an indicator or some other specific mark. The patents do not restrict themselves in such a way, and absent some compelling reason to do so, the Court will not read such a restriction into the patents.

The next issue is slightly more complicated. The parties dispute whether a "variable data area" can contain non-variable, static data. Tesseron argues that a variable data area may, in fact, contain static data. As figure 2 of the '387 Patent indicates, variable data areas are sometimes printed directly on top of static data areas, creating areas of overlap that contain both variable and static data. (Doc. 86, 33:23 - 34:11). Océ argues in response that even though "data areas" may overlap on a printed page, they are actually separate, mutually exclusive areas. (Doc. 65 at 11).

A "data area" is a "document area defined in the page description code specification." It is undisputed that areas of static and variable data may often overlap on a completed (printed)

document. Throughout the process described in the patents, however, variable and static data areas are mutually exclusive. For example, variable data areas and static data areas are defined separately in the page description code specification. Variable and static data–which are ultimately inserted into their respective "data areas"– are stored separately and onto different bitmaps (the template bitmap for static data, and variable bitmaps for variable data). It is likely undisputed that the template bitmap does not include variable data, and that a variable data bitmap does not include static data.

The key to defining this term is to recognize that a "data area" is a "document area"–it appears on the printed page. It is irrelevant that prior to printing, variable and static data areas are defined separately, and that variable and static data are stored separately. Accordingly, even though variable data areas and static data areas are mutually exclusive throughout the process, once a printed document is produced, areas often overlap. Thus, "variable data areas" may indeed include non-variable data on the printed document.

### 3. "Static Data Area"

There are two disputes with respect to this term, (1) whether a "static data area" is a part of the document or the page description code specification, and (2) whether it must include only static data. Both of these issues are resolved by the discussion above. A "static data area" is a "document area defined in the page description code specification," and it may include non-static data.

### 4. "Variable Data"

The parties dispute (1) whether "variable data" must be from a source external to the page description code specification, and (2) whether at least one instance of "variable data" must change from page to page.

The first issue concerns the source of "variable data." As Tesseron itself notes, there is an "express absence of any language characterizing the source of the 'variable data' within the [disputed] claims . . . ." (Doc. 64 at n. 31). Other claims do specifically refer to an "external file." For example, claim 21 of the '387 Patent states that "attribute items"[6] are stored in an "external file" or a "file external to the page description code specification." *See* '387 Patent, col.10, lns. 46-50. Claim 28 of the '387 Patent–which is not in dispute–states "a merge file external to the page description code specification include[s] a plurality of variable data items." '387 Patent, col. 11, lns. 23-25. According to Tesseron, however, "there's nothing restricting [variable data] from being included within the page description code specification." (Doc. 86, 52:8-9).

Although the disputed claims do not disclose the source of "variable data", the specification is clear that "variable data" is stored in a digital file separate from the page description code specification and ultimately "merged" with static data. For example, the summary of the invention refers to "variable data from a database or merge file," '387 Patent, col. 2, ln. 33, and that "[t]he merge task associates items of variable data from a data file . . ." '387 Patent, col. 2, lns. 47-48. *See also*, '387 Patent, Fig. 1; '387 Patent, col. 3, lns. 28-31 ("The merge task begins by retrieving a merge file containing the variable data to be printed."); '287 Patent, Fig. 1. Use of the word "merge" alone suggests that variable data must come from some independent source. In fact, there is no language in the claims or specification of either Patent to suggest that "variable data" can come from anywhere other than a digital file separate from the page description code specification.

---

[6] "Attribute item" is not a disputed term in this case. It appears, however, to refer to graphic states, and other "attributes" which can be specified for particular print job. *See* '387 Patent, col. 6, lns. 25-57.

Tesseron argues that since the source of "variable data" is not disclosed in the disputed claims, the doctrine of claim differentiation requires that they be read as broadly as possible–regardless of the description in the specification. *See Fuji Photo Film Co. v. Int'l Trade Comm'n*, 386 F.3d 1095, 1104-05 (Fed. Cir. 2004). Thus, any construction which requires that "variable data" be stored in an "external file" would be improperly importing a limitation from the specification into the claims. This argument is unavailing because, in this case, the doctrine of claim differentiation is unhelpful. *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1323 (Fed. Cir. 2011) *cert. denied,* 132 S. Ct. 2391, 182 L. Ed. 2d 1020 (U.S. 2012).

"Claim differentiation is a rule of thumb that does not trump the clear import of the specification." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1332 (Fed. Cir. 2009); *See also Eon-Net LP*, 653 F.3d at 1323; *Netcraft Corp. v. eBay, Inc.,* 549 F.3d 1394, 1400 n. 1 (Fed. Cir. 2008) ("While claim differentiation may be helpful in some cases, it is just one of many tools used by courts in the analysis of claim terms."). The claims of a patent do not stand alone. Rather, they are part of "a fully integrated written instrument," *Markman*, 52 F.3d at 978, "consisting principally of a specification that concludes with the claims." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). Claims "must be read in view of the specification, of which they are a part." *Id.* (citing *Markman*, 52 F.3d at 979). Thus, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id*. (citations and quotations omitted).

In this case, the specification and claims of the Patents clearly compel the construction that "variable data" must be stored in a digital file separate from the page description code specification.[7]

With respect to the second dispute, the specification in both Patents clearly states that "data in at least one field changes for each page." '028 Patent, col. 1, lns. 48-50; '387 Patent, col. 1, lns. 50-52. According to Océ, this means that variable data must change in at least one way, from page to page. (Doc. 65 at 4). Tesseron argues, however, that such a construction would lead to an absurd result. In a standard advertising mailer, for example, the name and city of the recipient is variable data. While this information will normally change from page to page, it is possible that there are two people with the same name in the same city. This would still be "variable data" even though it does not change from page to page. Like all "variable data," it is contained in a file separate from the page description code specification, merged into a "variable data bitmap," and ultimately into a "variable data area."

There is no language in the claims themselves that restricts the definition of "variable data" in the way Océ proposes. The language in the specification notwithstanding, a person of ordinary skill in the art would understand that the plain meaning of the Patents comports with Tesseron's construction–that variable data "may" change from page to page. *Markman*, 52 F.3d at 986. To restrict the Patents as Océ proposes would lead to a result clearly not contemplated by the Patents.

---

[7] Although the claims and parties use the term " external," the Court declines to do so because "external file" is a disputed term itself.

### 5. "External File"

There is only one issue with respect to this term, whether "external file" refers to any conceivable file, or whether it is limited to a "job file" or "merge file." In the specification, the Patents refer specifically to a "job file" or a "merge file," but Océ presents no compelling reason to read these limitations into the claims. Tesseron's definition is not so broad as to encompass anything, like a "paper file" as Océ suggests. A person of ordinary skill in the relevant art would understand that "external file" clearly refers to a digital file of some kind, separate from the page description code specification.

### 6. "Bit map"

The Microsoft Press Computer Dictionary defines "bit map" as follows: "[i]n general, a bit image. Specifically, a data structure that describes a bit image being held in memory, such as its location in memory and its size." *See* Microsoft Press Computer Dictionary 46 (2d ed. 1994). Neither party presents a good reason to construe the term differently.

### 7. "Template Bitmap"

The parties dispute whether the "template bitmap" must contain all of the static, non-variable background graphics and text. According to Tesseron, "template bitmaps are formed as the page description code specification is interpreted. Bitmaps are generated of the static data areas and then added to the template bitmap." In response, Océ cites to certain language in the patent indicating that the "template bitmap" is intended to contain "all the static data." (Doc. 65 at 9). One line of the '387 Patent, however, makes the answer to this dispute clear: "[a]t the final line of code, the template is complete, and incorporates all of the static text and graphic data that is to appear on

the printed document." '387 Patent, col. 7, lns. 30-32. In other words, while the "template bitmap" may eventually incorporate all of the static data to appear on a document, before the "final line of code," it does not. Accordingly, "template bitmap" means "a bitmap of the non-variable background graphics and text that is to appear on the printed document."

### 8. In the Printer

The first line of the first claim in both Patents states: "[a] computer implemented method . . . ." Nevertheless, Océ argues that the claimed process must occur "in a printer." In support it cites to a drawing in the Patents, the summary of the invention which states "the present invention assumes the generation of the page specification . . . and the transfer of this specification to a printer," '028 Patent, col. 2, lns. 54-57, and finally, the detailed description in the '387 Patent which states "a control task operates in the printer . . ." '387 Patent, col. 4, ln 43.

This analysis must start with the "strong presumption" that the language in the claims mean what they say." *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003). In this case, the very first claim begins with the language "computer implemented method." Even though the specification describes the preferred method occurring largely "in a printer," this is because the invention is intended primarily for commercial printing applications where "printers" are integrated with computers. It is not intended to limit the scope of the patent in any way–especially considering the language in the claims themselves.

### 9. "Processing"

"Processing" is a common term used in the computer industry. The Microsoft Press Computer Dictionary defines it as, "manipulating data within a computer system." (Doc. 64 at 20). The Court sees no reason to define it otherwise.[8]

### 10. "Producing"

Finally, the parties dispute the meaning of the word "producing." Océ argues that it means simply "to create," while Tesseron contends that the plain and ordinary meaning is obvious, it means "to produce." A brief review of standard English dictionaries suggests that "produce" can have many meanings. It can mean, for example, (1) to offer to view or notice, (2) to give birth or rise to, (3) to cause to have existence or to happen, or (4) to compose, create, or bring out by intellectual or physical effort. *See, e.g.,* Webster's Collegiate Dictionary 930 (10th ed. 1996); American Heritage College Dictionary (3d ed. 1997). None of these definitions are useful for a term that is commonly understood. "Producing" means simply "to produce." To further define or limit such a common term is unnecessary. *See Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).

---

[8] Océ's proposed definition–that "processing" refers only to "processing the page description code specification"–is confusing given the language in claim 21 of the '387 Patent– ". . . processing the page description code specification . . . ."

**IV. Conclusion**

The Court therefore proposes to construe the disputed terms in Claim 4 of the '028 Patent and Claims 1-19, 21 and 22 of the '387 Patent as stated in the foregoing analysis. The Parties may file briefs, not to exceed **ten (10) pages**, raising any objections they have to the above construction by no later than **Friday, September 21, 2012.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 5, 2012.

Copies furnished to:

GREGORY A. PRESNELL
**UNITED STATES DISTRICT JUDGE**

Counsel of Record

Unrepresented Party

-13-